BALDWIN *v.* GRAND TRUNK RAILWAY CO.

1. CARRIERS—INJURY TO PASSENGER—WEIGHT OF EVIDENCE—NEW TRIAL.

Plaintiff recovered a verdict for injuries alleged to have been received by the sudden starting of defendant's train while he was in the act of alighting therefrom. The action was not brought until two years after the alleged injury, and plaintiff had previously made no claim against defendant. His case was based solely on his own testimony. Experienced men testified that it would be impossible to start a train, equipped as was the one in question, with a jerk sufficient to throw a person from the steps in the manner alleged by plaintiff. Plaintiff testified that certain men, whom he knew well, were engaged in running the train, but this was contradicted, not only by the records of defendant, but by the testimony of the men themselves; and the men who claimed to have been in charge of the train testified that there was no such occurrence as alleged by plaintiff. *Held*, that a motion for a new trial, on the ground that the verdict was contrary to the evidence, was improperly denied.

2. SAME—TRESPASSERS.

One who enters a train knowing that it is not scheduled to stop at the station to which he is destined, but that it sometimes does stop there, cannot be regarded as a trespasser until he has been notified by the conductor that it will not stop, and has refused to comply with the conductor's requirements to leave at a station before reaching his destination, or go to the one beyond.

Error to Macomb; Tucker, J. Submitted April 18, 1901. Decided October 8, 1901.

Case by Fred C. Baldwin against the Grand Trunk Railway Company of Canada for personal injuries. From a judgment for plaintiff, defendant brings error. Reversed.

No objection is made to the statement in appellant's brief. That statement is as follows:

"The plaintiff claims that on the night of July 2, 1897, he went to the defendant's station agent at New Haven, in the county of Macomb, to inquire of the agent whether he could go to Mt. Clemens, and return that evening on No. 4, the midnight train, which was not scheduled to stop at New Haven. The plaintiff knew that said train was not scheduled to stop at New Haven. He had himself, posted in his saloon, a copy of the defendant's printed time card showing the fact. He says that the agent at first told him that the train would not stop; that he then started to go home, and that, after he had gone a short distance, the agent called him back, and told him that, if he would buy a ticket to Mt. Clemens and return, the train would stop; that he then bought a return ticket, and took the 8:18 train for Mt. Clemens; that he took No. 4 at Mt. Clemens to return to New Haven, leaving Mt. Clemens between 11 and 12 o'clock the same night; that, after the train had run between one and a half and two miles from Mt. Clemens station, the conductor came to him; that the plaintiff then showed his ticket to the conductor, who informed him that the train did not stop at New Haven, and that he would have to go to Lenox, the first station beyond New Haven at which the train would stop; that nothing further was said until the train had arrived within about one mile of New Haven station, when the conductor came to the plaintiff, and, with an oath, told him to get off, and to never get on that train again; that the plaintiff followed the conductor out onto the platform, went down onto the bottom step, and, while standing on the bottom step in front of the depot, the conductor gave the engineer a signal, and the train started up suddenly, and with a jerk, and threw him onto the platform, and he sustained an injury to his arm."

The negligence charged is the starting of the train before plaintiff had alighted from the steps. The court instructed the jury that plaintiff knew that the train he took was scheduled not to stop at New Haven, and left the question of negligence to the jury under the following instructions:

"1. I instruct you, as a matter of law, that the plaintiff, in going upon and taking passage upon the train of defendant company on the evening in question, did not become a trespasser by so doing; that when on said train

defendant company had a right to demand of him payment for his fare to Lenox, the next scheduled stopping place; and, if such payment had been refused by plaintiff, the defendant could have ejected him from such train,—that is, the employés of the defendant could have ejected him.

"2. If the employés of the defendant company in charge of said train, knowing that said plaintiff desired to get off therefrom at New Haven, accepted his ticket thereto in payment for his fare on said train to New Haven, and thereupon stopped said train, and invited or directed the plaintiff to get off from said train, it was the duty of said defendant's employés to cause said train to remain stationary for a sufficient length of time to allow the plaintiff to alight in safety therefrom; and if the said defendant company, through its said employés in charge of said train, negligently caused the train to jerk or start while the plaintiff was in the act of alighting therefrom, and with such force as to throw the plaintiff from the train to the platform of the depot and injure him by reason thereof, such an act on the part of defendant company's employés would be negligent, and would entitle the plaintiff to recover such damages as he has proven that he sustained, if you are also satisfied that he was at the time in the exercise of due care himself.   *   *   *

"3. But I think, under the circumstances of this case and of the running of this train, and the fact that it did stop at times at New Haven, plaintiff would have a right to go upon this train at Mt. Clemens, and take his chances of getting off at New Haven, provided he paid the fare to the next regular stopping point in case the train did not stop at New Haven; and there is no evidence that he declined to pay the fare to Lenox. But, the conductor having accepted the ticket to New Haven, I think it was the duty of defendant to stop the train long enough to give the plaintiff sufficient time to alight while he was himself in the exercise of due care.   *   *   *

"4. That when said train came to a full stop in front of the station of defendant at New Haven, and while plaintiff was going down the steps of such coach, the said conductor signaled with his lantern to the engineer of said train to go ahead."

Verdict and judgment for plaintiff.

*Geer & Williams* (*E. W. Meddaugh*, of counsel), for appellant.

*John A. Weeks* (*S. W. Knight*, of counsel), for appellee.

GRANT, J. (*after stating the facts*). 1. The appellant moved for a new trial on the ground that the verdict was contrary to the evidence. The court refused to grant it, and appellant duly excepted. While it is unpleasant to an appellate court to review the action of the court below in refusing to grant a new trial for the reason alleged, yet the statute imposes the responsibility, which we cannot evade. The plaintiff's case is based upon his own testimony alone. No one saw him fall. He made no complaint for over two years, but waited until the station agent had removed from the State; until, in the due course of business, the ticket sold had been destroyed; and then commenced action without having made any claim to the railroad company to give it an opportunity to examine into the case, or settle if it chose. He was an intemperate man, and was at the time of the trial under bonds to keep the peace. The manner of the accident, as described by him, is improbable. The train had stopped, according to his own testimony. He stood upon the lower step, ready to alight. The train consisted of five cars, two of which were sleepers,—a heavy train. The train was equipped with Gould couplers. Five experienced men testified that it would be impossible to start that train with a jerk sufficient to throw a passenger standing upon the lower step and in the act of alighting. His own version of the accident is as follows:

" When the train stopped, he says, ' God d——n it, get off from here !' The train stopped right in front of the depot. When he made that remark, I went to get off. He · shook his lantern this way [indicating] for the engineer to go ahead.

" *Q*. What happened then ?

"*A*. I fell off. I got off in some way. I fell, anyway. I suppose it was the jerk from the engine when he pulled

ahead that made me fall. ˙ It was a sudden jerk. I was on the bottom step of the car, holding on to this handle on this side of the car. I had some glasses in my other hand. I couldn't tell how I did fall. When I got off I was headed towards Port Huron. When I got up I was looking towards Detroit. I must have turned a somerset."

Plaintiff swears positively that one Donohue was conductor, and one Duval the brakeman, of the train. He knew Donohue well, and had known Duval from his boyhood. There was no chance for him to be mistaken. He swore that these were the conductor and brakeman of the train, and that both were present when he was thrown. It is conclusively demonstrated by the records of the company that these two men were not upon that train that night. They were part of another train crew upon an earlier train to Detroit that day. The crew of the train upon which plaintiff claims he was, and by which he was injured, were one Chandler, conductor; Cooper, brakeman; Kelly, baggageman; and Fuller, engineer. These were present in court before plaintiff took the stand as a witness. He knew them, and saw them in the courtroom. Donohue and Duval were not there. After plaintiff had testified so explicitly and positively that these two were the ones in charge of the train, the defendant was able to produce them before the trial ended, and they testified that they were not upon the train, and that no such occurrence ever happened while they were in charge of any train. The four men comprising the train crew on the night plaintiff claims to have been injured were all produced and sworn, and all testified that no such occurrence ever took place. We then have this plaintiff contradicted by six men, and by the unimpeached record made at the time. It is not too harsh to say that such verdict is based upon something else than the reliable testimony in the case, and it was the duty of the court to promptly set it aside, and grant a new trial.

In *Schmeltzer* v. *Railway Co.*, 80 Minn. 50 (82 N. W. 1092), plaintiff claimed to have been thrown by the

sudden starting of the car while he was entering and was upon the steps. The testimony of the plaintiff and his witnesses as to the manner of the fall and the starting of the car was stronger than in this case. The supreme court reversed the verdict, and granted a new trial, because the testimony was so indefinite and uncertain; and in doing so said:

"We share the respect of the learned trial judge for the jury system, and our respect therefor is only shaken or lessened when confronted with palpably unjust verdicts, —verdicts which find no support in the evidence, and can only be accounted for on the theory of bias and prejudice."

See, also, *Brown* v. *Paper Co.*, 65 N. J. Law, 111 (46 Atl. 756).

2. In view of a new trial, it is important to determine one other question: What relation did plaintiff bear to the defendant while on its train? He contends, and bases his declaration upon the theory, that he was a passenger, entitled to all the rights and privileges of a *bona fide* passenger, and that defendant is liable in damages to him for any injury caused by its negligence. The defendant contends that plaintiff was a trespasser, that he had no right to enter this train for carriage to New Haven, and that the defendant would only be liable to him for gross or willful negligence.

If the defendant's train had been scheduled never to stop at New Haven,—the plaintiff's home station,—there would be great force in the contention of the defendant, and many authorities fully sustain it. But it is conceded that the defendant's train did stop sometimes at New Haven, and always stopped when it had passengers from Detroit to that point. We think a passenger knowing this fact would have a right to enter the train hoping that it might stop there, and that such passenger could not be placed in the position of a trespasser until the conductor had notified him that the train would not stop there, and that he must stop at some other station before reaching New Haven, or go to the next station beyond. If he had

failed to comply with any such requirement on the part of the conductor, he might then be put in the position of a trespasser.

Judgment reversed, and new trial ordered.

HOOKER, MOORE, and LONG, JJ., concurred. MONT-GOMERY, C. J., did not sit.